1            UNITED STATES DISTRICT COURT

2         FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4  UNITED STATES OF AMERICA,              )
                                          ) No. 15-CR-2310-WQH
5         Plaintiff,                      )
                                          ) December 15, 2017
6             v.                          )
                                          ) 2:03 p.m.
7  OWEN HANSON,                           )
                                          ) San Diego, California
8         Defendant.                      )
   _____ )

9

10

11            TRANSCRIPT OF SENTENCING HEARING
            BEFORE THE HONORABLE WILLIAM Q. HAYES
                UNITED STATES DISTRICT JUDGE
12
   APPEARANCES:
13
   For the Plaintiff:        United States Attorney's Office
14                           By:  ANDREW YOUNG, ESQ.
                                  BENJAMIN KATZ, ESQ.
15                           880 Front Street, Room 6293
                             San Diego, California  92101
16
   For the Defendant:        Law Offices of Mark Adams
17                           By:  MARK ADAMS, ESQ.
                             964 Fifth Avenue, Suite 214
18                           San Diego, California 92101

19

20

21

22  Court Reporter:          Melinda S. Setterman, RPR, CRR
                             District Court Clerk's Office
23                           333 West Broadway, Suite 420
                             San Diego, California, 92101
24                           melinda_setterman@casd.uscourts.gov

25  Reported by Stenotype, Transcribed by Computer

```
 1            SAN DIEGO, CALIFORNIA, DECEMBER 15, 2017, 2:03 P.M.

 2                              * * * *

 3       (Defendant present.)

 4            THE CLERK:  Matter number 4, 15-CR-2310, United States

 5  of America vs Owen Hanson.

 6            MR. ADAMS:  Good afternoon, Your Honor.  Mark Adams on

 7  behalf of Owen Hanson.  He is present in court.

 8            MR. YOUNG:  Good morning, Your Honor.  Andrew Young

 9  and Benjamin Katz for the United States.

10            THE COURT:  Good afternoon.

11            Counsel, I have reviewed the addendum -- the

12  presentence report, the addendum to the presentence report, the

13  objections to the presentence report, the defense sentencing

14  memo, the defense sentencing recommendation, the Government's

15  sentencing summary chart, the Government's sentencing memo and

16  reply to the presentence report, the Government's motion, the

17  defense submission of 12/7, and the Government's submission of

18  12/14.

19            Counsel, have you had an opportunity to review and

20  discuss the presentence report with your client?

21            MR. ADAMS:  Yes, Your Honor.  Did Your Honor mention

22  the defense submission of 11/22?

23            THE COURT:  Yes.  Well -- yes, and I have reviewed

24  that.  That is -- I titled that defense sentencing

25  recommendation, and so when I said defense sentencing
```

02:03 (line 5)
02:03 (line 10)
02:03 (line 15)
02:04 (line 20)
02:04 (line 25)

1    recommendation --

2              MR. ADAMS:  Very good.

3              THE COURT:  -- I was referring to that document.

4              MR. ADAMS:  Thank you, sir.

02:04  5              THE COURT:  With respect to the objections to the

6    presentence report, you object to paragraph 21 that references

7    that in August of 2011 Hanson threatened RC and RC's spouse

8    with bodily harm if RC refused to transport an additional two

9    and a half million of criminal proceeds from Australia to the

02:05  10   United States.

11              Your position is that there was no threat; is that

12   right?

13              MR. ADAMS:  Yes, Your Honor, that there was no direct

14   threat.  That is correct.  There had been threats on the other

02:05  15   direction, frankly.

16              THE COURT:  And, you know, in light of the fact

17   that -- there is no objection to paragraph 22, 23, 24, 25, that

18   also deal with some threats purportedly made or indirectly made

19   by your client, and paragraph 20 deals with in 2011 Hanson

02:05  20   attempted to cause an individual -- excuse me -- paragraph 19

21   talks about Hanson causing an individual to transport one and a

22   half million in drug trafficking proceeds from Australia to Las

23   Vegas, Nevada.

24              Paragraph 21, the paragraph that you object to,

02:05  25   frankly, would not have any impact on the sentence.

1          Does the Government wish to be heard on the objection?

2          MR. YOUNG:  No.  That is the point we tried to make in

3     our response.  Although, I concluded fewer paragraphs than the

4     Court mentioned.

02:06    5          THE COURT:  I'll sustain the objection -- or it just

6     won't have any impact --

7          MR. ADAMS:  Fair.

8          THE COURT:  -- on the sentence.

9          With respect to the paragraph 38, that deals with his

02:06   10     conduct while he's been in custody, I take that by way of

11     explanation.

12          MR. ADAMS:  Yes, sir.

13          THE COURT:  And then with respect to paragraph 42, I

14     take that as an additional explanation.  And then, you know,

02:06   15     the criminal history, I just don't know whether -- I'll

16     consider that.  I just don't know whether the criminal history

17     at this point is really going to have an impact on the

18     guidelines, but I'll certainly consider that during the

19     argument section of the sentencing.

02:07   20          And then the last objection is the paragraphs that

21     deal with -- that is, paragraphs 99 to 101 -- really deal with

22     the issues with respect to a clarification of the financial

23     information; is that right?

24          MR. ADAMS:  Correct, Your Honor.

02:07   25          THE COURT:  And then I understand that -- and you just

1    object to an imposition of a fine.

2          Counsel, have I addressed all of the objections to the

3    presentence report?

4          MR. ADAMS:  You have, Your Honor.  Thank you.

02:07    5          THE COURT:  All right.  May I see counsel at sidebar

6    to deal with an issue that was raised in more recent filings.

7          MR. ADAMS:  Yes, sir.

8       (Side Bar proceedings took place, Record sealed.)

9          THE COURT:  We'll be in recess for ten minutes.

02:18   10       (Recess ensued from 2:18 p.m. to 2:22 p.m.)

11          THE COURT:  From the Government -- you can come

12    forward.

13       (Sidebar proceedings:)

14          THE COURT:  There may be an issue -- I'll wait for

02:23   15    Mr. Adams, but I think Mr. Adams was requesting that the

16    marshals not be present and the marshals have to be.  And if

17    Mr. Adams wants it to be private, he can continue this or he

18    can talk to him out there.  That is the purpose of it.

19          Mr. Adams, the marshals have told me that you would

02:23   20    like privacy, and the procedures don't allow them to leave the

21    room.

22          MR. ADAMS:  But he is in the lock up now, and they are

23    looking in through the window, so they can see where we are.

24          THE COURT:  Have they worked that out?

02:23   25          MR. ADAMS:  They worked it out with their supervisors.

1           THE COURT:  Is that worked out?

2           THE DEPUTY MARSHAL:  Yes.  Unbeknownst to me, when we

3    were discussing it, it was worked out.

4           THE COURT:  All right.  Take your time.

02:24   5    (Sidebar proceedings concluded.)

6    (Recess ensued from 2:24 p.m. to 2:30 p.m.)

7           THE COURT:  Mr. Adams, you wish to come sidebar?

8           MR. ADAMS:  Yes, Your Honor.  Thank you.

9    (Side Bar proceedings took place, Record sealed.)

02:37   10          THE COURT:  All right.  Mr. Adams, are there any

11   comments that you would like to make, sir, with respect to the

12   sentence that the Court should impose?

13          MR. ADAMS:  Yes, Your Honor.  I -- thank you.  I do

14   want to acknowledge and introduce some of the folks whose taken

02:37   15   time this afternoon to come to this sentencing hearing.  Many

16   have come from great distances, including Mr. Hanson's father

17   and his mother is here.  His sister is here.  Some friends from

18   Los Angeles, Dan Halliday, Brandon Hancock, Bill Hancock,

19   Cynthia Valarde is here, his sister-in-law, and his wife's aunt

02:38   20   is here, and his two step kids are here as well.

21          His wife couldn't be here.  She has another family

22   member in Mexico whose having surgery -- or had surgery

23   yesterday, something like that, and she is looking after her,

24   and so there is a community of people that are and remain very

02:38   25   supportive of Mr. Hanson.

1          Your Honor, I want to say that the consequences of

2   what happens here today will resonate with Owen Hanson and with

3   his family for a lifetime.  He alone is responsible for that.

4   No matter what sentence Your Honor imposes, Owen Hanson will be

02:38   5   under court supervision for a very, very long time.

6          We're asking for 121 months.  We're also asking for

7   ten years of Supervised Release to follow, and Your Honor knows

8   that we agreed to a $5 million forfeiture judgment.

9          He'll be under -- if Your Honor agrees with us, he'll

02:38   10   be under court supervision for at least 20 years.  The

11   forfeiture judgment will likely impact his life forever, and it

12   will require him to report regularly his financial situation to

13   government authorities.

14          THE COURT:  Excuse me for interrupting, Mr. Adams.

02:39   15   So -- when you are referring to what he has agreed to, is it

16   correct to say that there is no objection to the proposed order

17   of forfeiture that has been submitted to the Court by the

18   Government?

19          MR. ADAMS:  That's correct.

02:39   20          THE COURT:  All right.  I'll sign that now.  Thank

21   you.

22          MR. ADAMS:  Yes, sir.  I know Your Honor has reviewed

23   a lot of materials.  We presented a lot of letters and a lot of

24   information to the Court, and I really want to endeavor not to

02:39   25   repeat all that, but I do want to point out that Owen was

1   raised in Redondo Beach.  He grew up in a very wealthy

2   community, went to USC.  He was fortunate to have been able to

3   go to that University.  He was exposed, again, to extraordinary

4   wealth.

02:39   5          He entered the job market 2005, 2006.  It was in real

6   estate and real estate development.  He enjoyed early success

7   in that, and then the economy, particularly in real estate,

8   collapsed in 2007, 2008, but -- and he went entirely the wrong

9   direction.  He went into this gambling organization.  He went

02:40   10   into narcotics distribution in order to fuel his lifestyle, and

11   he excelled in those things in a very negative way.

12          And it is likely a testament to his charisma and his

13   charm and his great personality that is described by many of

14   the letter writers.

02:40   15          He was using drugs and alcohol at the time.  It

16   certainly clouded his judgment, and I would like to think that

17   he was completely out of control.

18          He has accepted responsibility here.  He has worked

19   hard to rehabilitate himself and to address those character

02:40   20   flaws.  I think it is important to note that Owen Hanson really

21   on the whole record of who he is and his whole life is not a

22   dangerous person.  He is not a drug kingpin in the true sense

23   of that term.

24          He made connections with sources of supply and with

02:41   25   distributors.  He found ways for people to import and tranship

1    drugs.  And, again, his winning personality I think helped him

2    in that endeavor.

3         And he didn't control those other people.  He didn't

4    control those entities beyond the transactions really in which

02:41   5    they were involved.  And in denying bond and ordering

6    detention, the magistrate judge found risk of flight but not a

7    danger to the community on the record.

8         Owen was also a pretty reckless person.  He met with

9    undercover agents just before his arrest, and he pretty much

02:41   10   outlined the whole operation to those undercover agents and

11   implicated himself in another actual transaction with those

12   undercover agents.

13        I think from the whole record of his life and the

14   things that we've seen in the letters and in his background,

02:42   15   that fundamentally Owen Hanson is a good person.  He is a

16   caring and thoughtful person, and he does truly enjoy helping

17   other people.  He has a great family and family support, and

18   that is good, and that will serve him well in the coming years.

19        We're here today, though, to talk about I think

02:42   20   punishment, and ten years in prison it is a long, long time,

21   and then ten years of further supervision that will have him

22   under this Court's control for a great deal -- a great number

23   of years.

24        I think the letter from the MCC counselor in the drug

02:42   25   program is unique.  I've seen very few of those letters over

the years.  It demonstrates the extent of Owen Hanson's

commitment to others and his commitment to his own sobriety.

His own letter to the Court also I think is remarkable in what

it reveals about his character and his desire to become a

02:43    better person and make contributions to help others grow and to

mentor others.

Owen's community of family and the people who care

about him have hope and I think great expectations for his

future when he is released from prison, and all of them are

02:43    convinced that a more humble Owen Hanson will be a better

version of him and the best version of Owen Hanson yet.

We're asking for 121 months in custody.  We're asking

for ten years of Supervised Release to follow and a

recommendation to the RDAP program.  He has already

02:43    participated in the pre-RDAP, if you will, at the MCC, and I

think he could really benefit and continue to benefit and

benefit others in those programs through his commitment and

also a recommendation to either Terminal Island or Lompoc to

further family visitation.

02:44    THE COURT:  All right.  Thank you.

Any comments that you would like to make, sir?

THE DEFENDANT:  Yes, Your Honor.  Your Honor, a few

years before my arrest I had made some very bad decisions on

both the practical and moral level.  I had acted selfishly

02:44    without regards for others, knowingly broke the law, lied to my

1    loving family, and separated myself from my true friends.

2            With that being said, I am here today to accept full

3    responsibility for my actions, and I am prepared to face the

4    consequences of my wrongdoing and accept the punishment Your

02:44   5    Honor decides.

6            I would like to take this time to thank my family and

7    friends.  As you know, some of them are here today.  Their love

8    and support over the past two years has meant the world to me.

9    I am truly aware of all the pain, worry, and embarrass I have

02:45   10    caused those closest to me, and I would like to apologize for

11    what I put my family and true friends through.

12            Sorry guys.  Thank you.

13        (Spanish language phrase given by the Defendant.)

14            Your love and support has meant the world to me.

02:45   15            Judge Hayes, as I get older, it is clear to me that

16    time is the most precious currency on earth, and to be given a

17    second chance into society to mature as a law abiding and

18    productive citizen would mean the world not only to myself but

19    to my family here today.  I will not disappoint this time

02:45   20    around.

21            I plan to turn this negative part of my life into a

22    positive one, by helping children and young adults with

23    addiction issues.  I learned so much about myself, and

24    addiction through the programs here at the MCC.  I've had the

02:46   25    chance to teach the GED to children that haven't -- young

1    adults that haven't had education and currently reached out to

2    an organization called The Smart Recovery, and I am ready to

3    start now helping children while in custody and when I am

4    released.

02:46    5         Finally, I hope all of you will take into

6    consideration the fact that my family has been dependent upon

7    me for the past seven years.  My wife and children have

8    suffered during my incarceration.  My immediate family has had

9    to help while I've been in custody.  This has been extremely

02:47   10   humbling yet entirely my fault.

11        Thank you, Your Honor, for your close consideration of

12   my case.

13        THE COURT:  Thank you, sir.

14        From the Government.

02:47   15   MR. YOUNG:  Yes, Your Honor.  If it is okay with the

16   Court, I would like to take the podium.

17        THE COURT:  Certainly.  And before you begin your

18   presentation, just a couple questions I have for the

19   guidelines, and so the -- the guidelines per the plea agreement

02:47   20   are 360 to life; correct?

21        MR. YOUNG:  That's correct.

22        THE COURT:  And the -- a three-level recommendation

23   for a departure would then set it -- the guideline to 262 to is

24   it 320 -- 327?

02:47   25        MR. YOUNG:  327.

1          THE COURT:  So a three-level adjustment.  The

2     Guideline Range is 262 to 327; correct?

3          MR. YOUNG:  Correct.

4          THE COURT:  And then as I understand it, the

02:48   5     Government intends to make a recommendation of 235.

6          MR. YOUNG:  That's correct.

7          THE COURT:  And the Government intends to make a

8     three-level recommendation of a departure, and then they --

9     they are requesting the Court to vary from 262 to 235; is that

02:48   10    right?

11          MR. YOUNG:  235, correct.

12          THE COURT:  Correct.  And -- all right.  And I

13    understand, certainly, Mr. Adams' request was that -- basically

14    a combination as well -- it was a departure plus some variance.

02:48   15         So are there any comments the Government would like

16    make, sir?

17          MR. YOUNG:  Yes.  First, with regard to the

18    recommendation --

19          THE COURT:  Do we have the person on the line?

02:48   20          THE CLERK:  No, Your Honor.

21          THE COURT:  There is a victim who wanted to appear, so

22    let's put her on -- put that individual on the line.

23          THE CLERK:  Yes, Your Honor.

24          THE COURT:  We had a victim that wanted to appear and

02:48   25    wants to be heard.

|  | 1 | THE CLERK:  My apologies, Your Honor. |
|---|---|---|

THE CLERK:  My apologies, Your Honor.

THE COURT:  All right.  Let's try again.  Thank you.

MR. CIPRIANI (telephonically):  Hello.

THE CLERK:  Mr. Cipriani.

02:50  MR. CIPRIANI (telephonically):  Yes.

THE CLERK:  This is Patricia with Judge Hayes.  Can you hear me okay?

MR. CIPRIANI (telephonically):  Yes, I can.

THE COURT:  Mr. Cipriani, we're in the sentencing. This is Judge Hayes.  This is not your opportunity to speak yet.  I am going to hear from the Government.  Then I'll give you an opportunity to speak.  If you can remain on the line, and when it is an opportunity for you to speak, you can speak. Do you understand, sir?

02:50  MR. CIPRIANI (telephonically):  Yes, sir.  Thank you, Judge.

THE COURT:  All right.  You're welcome.

All right.  Government, you may speak.

MR. YOUNG:  Thank you, Your Honor.

02:50  As you mentioned a moment ago, the Government's recommendation is 235 months.  That is obviously five months below the current mandatory minimum in this case.  The Government would move to dismiss the 851 enhancement to align itself with the Government's recommendation.

02:51  THE COURT:  That is granted.

1          MR. YOUNG:   Thank you.

2          There are essentially three things that I want to talk

3     about today with regard to this defendant and why he is sitting

4     in that seat that he is in today -- in which he is sitting in.

02:51   5          At the time he was arrested this was not a one-time

6     incident.  This was not a decision made in haste.  It wasn't a

7     decision made out of economic desperation.

8          When he was arrested by law enforcement and

9     essentially stopped from doing what he was doing, he was

02:51  10     ascending.  His criminal career was rising.  He had started it

11     from scratch.  He had built the business -- the illegal

12     businesses that he was operating, and he was on his way up.

13          And the reason that he had chosen the life that he had

14     was in part because he idolized organized crime, and I am going

02:51  15     to speak a little bit more about that later, but he wanted a

16     perception of himself to go out to the war -- to go out to the

17     world, and that was of a mob boss, and he did this for two --

18     for main one reason, which was greed.

19          He wanted to be perceived as a big shot in the illegal

02:52  20     world, and he wanted to have a life of luxury, and he was only

21     willing to obtain the money, obtain the means for that life,

22     through illegal activity.

23          With regard to the ascendency that he took in his

24     criminal life, as I mentioned, he built this business from

02:52  25     scratch, and it started when he was a student at the University

1   of Southern California.  He provided drugs and steroids to his

2   teammates, and it was a small business, but it was a business

3   nonetheless.

4           And as he grew that business, it eventually grew into

02:52   5   a drug trafficking operation that transported thousands of

6   kilos, thousands of kilograms of cocaine from Southern

7   California to Chicago.  It transported hundreds of kilograms

8   from Southern California to Australia.

9           And one of the reasons one might ask himself is why go

02:53   10   through all the effort to get drugs from Southern California to

11   Australia when there are other opportunities.  And it is the

12   profit margin.  It is arbitrage.  A kilo of cocaine in Southern

13   California costs approximately $25,000.  A kilo in Australia

14   costs approximately $200,000.

02:53   15           So if you are inclined to join this type of activity,

16   that is an opportunity you might wish to exploit, and

17   Mr. Hanson exploited that opportunity.  And as part of that, he

18   had to get his money back from Australia, and he took a variety

19   of ways in doing that.

02:53   20           In part, you heard from Mr. Cipriani and how he used

21   him to get back millions of dollars into the United States.

22   That is the big sum.

23           He moved it back in smaller sums as well.  He had

24   other friends wire back money under false means into the United

02:53   25   States.  He even went so far as to smuggle gold coins in Ugg

1    Boots to get his profits from Australia back into the United

2    States.

3           The drugs that Mr. Hanson was trafficking, however,

4    were not just limited to cocaine.  When he was interacting with

02:54  5    the undercover agent in this case, he asked him to get him five

6    kilos of methamphetamine.  Within a short period of a few days,

7    Mr. Hanson had the connections to get a high purity of

8    methamphetamine, five kilos, and did it quickly without

9    considerable -- what did not appear to be a considerable amount

02:54  10   of effort.

11          He continued to provide steroids and human growth

12   hormone to numerous professional athletes in the United States.

13          That was his drug operation, and obviously the drugs,

14   the quantities, the types drive the guidelines in this case,

02:54  15   but the Court shouldn't ignore the under card violations in

16   this case either, which was his gambling operation.

17          As the Court may be aware, Mr. Hanson was a small

18   player in another gambling organization called Macho Sports

19   that was prosecuted within this district.  When Macho -- when

02:55  20   the US Attorneys Office here was prosecuting Macho Sports,

21   Mr. Hanson was tipped off that the FBI was starting to

22   investigate him.

23          He did not take that warning.  He did not take that

24   tip.  He did not take his perception of Macho Sports being

02:55  25   taken down as warning, as an opportunity to get out of the

business, an opportunity to take better -- make a better choice

and start going on a legal path in life.  He took it as an

opportunity to grow his own business, which is what he did.

By the time he was arrested, he was generating -- the

02:55  illegal gambling business was generating ten millions dollars

in revenue.  He hired a CPA to clean his money and to create

sham companies to move the money around so that they could pay

off gamblers.  He hired private investigators to look for

gamblers who owed him money and track them down.

02:55  And he hired, as this Court is aware, hired thugs to

approach those gamblers, the delinquent gamblers, to force them

-- to make them pay up, and to do that he used violence.

As this Court is aware he paid Jack Rissell to travel

from Los Angeles to Minneapolis to confront and attack a

02:56  gambler in Minneapolis.  He went to his home.  Mr. Rissell went

to his home and physically attacked him outside of his house --

outside of his apartment, where his young son was within the --

was within the apartment.

He paid Rissell an hourly fee to do it, and he

02:56  provided a bonus for the attack.  Now, Mr. Rissell recorded

this attack on video, and when he showed it to the defendant,

the defendant responded, "I paid for a smack down, not a soap

opera."  So he wasn't satisfied with the level of violence that

Rissell brought down on this victim in Minneapolis.

02:57  The violence didn't stop there.  The intimidation and

1    threats of violence didn't stop there.  You'll hear from

2    Mr. Cipriani.  For a period of several years, this defendant

3    continued to harass and threaten Mr. Cipriani.  He paid

4    Portely-Hanks, who is a co-defendant in this case, who this

02:57   5    Court has sentenced, to travel to Philadelphia to locate

6    Mr. Cipriani's gravestone, to throw red paint on it, take

7    photos of it and send it to Mr. Cipriani as a clear threat.

8            If the threat wasn't clear enough, he added a photo

9    shopped date of death "very soon" near Robert Cipriani's name.

02:57   10   And the entire episode of Mr. Cipriani resulted in him

11   ultimately receiving a DVD that depicted two individuals who

12   were decapitated, one with a chain saw and another with a

13   knife, and the threat was clear, pay up or this could happen to

14   you.

02:58   15           I mentioned earlier that Mr. Hanson's motivation here

16   was two things.  One was to be perceived by the world as a mob

17   boss, and the other was greed.  And I think the greed is best

18   evidenced in the forfeiture order.  As result of his crimes, he

19   is forfeiting houses in Peru, Costa Rica, and Cabo San Lucas,

02:58   20   luxury vehicles, including a Porsche and two Range Rovers, gold

21   and silver coins, hundreds of thousands of dollars in luxury

22   watches and jewelry, art, and cash that was secreted in private

23   vehicles throughout the United States and in private vaults

24   that required retina scans to enter the secret compartments of

02:58   25   cars, secret compartments underneath bathtubs in apartments in

1    New Jersey and cash that was held by several of his

2    coconspirators.

3         Now, he -- and I mention this earlier -- he was caught

4    at the early stages of his career, and it didn't stop when he

02:58   5    was arrested.  After he was arrested, before his coconspirators

6    were arrested on the larger superseding indictment that

7    followed in January of 2016 -- Mr. Hanson was originally

8    arrested in September October of 2015 -- during that period

9    where his coconspirators on the gambling side were outside of

02:59  10    prison, he gave them a message, and the message was clear, and

11    it was, keep the business running, boss' orders.

12         Even after law enforcement managed to pull him off the

13    streets, he continued to try to operate and run his business.

14    He did it with a lot of people this Court has already seen, and

02:59  15    a lot of people have already been in front of this Court.  And

16    the Court has experienced this.  You've met these individuals,

17    and they know why they are here, and it is not to excuse their

18    behavior.  They have all admitted guilt.

19         But I think at this point to a man, they have all said

02:59  20    that "but for" Owen Hanson, they would not be in the position

21    that they were in, that he found their weaknesses and he

22    exploited them.

23         And there is a comment in our sentencing papers that I

24    think is worth repeating here, which was, He found gamblers and

03:00  25    turned them into bookies because they owed him money.  He found

1    addicts, and he turned them into drug addicts to continue to

2    fund their own -- he found addicts and turned them into drug

3    dealer to fund their own addiction.  He turned his own friends

4    into felons.

03:00    5         It is not to excuse the behavior of his co-defendants

6    in this case, but the fact is is that associating with Owen

7    Hanson during this period destroyed the lives of many people,

8    and it is a responsibility that he should carry.

9         Now, with regard to the perception he wanted the world

03:00    10   to see of him, he idolized organized crime.  That is evidenced

11   throughout the evidence in this case.  When he operated his

12   drug trafficking business, he used an encrypted Blackberry to

13   do so.  The handle that he chose to use was Don Corleone, which

14   is a clear call out to the movie The Godfather.

03:00    15        He invested in a restaurant with Luke Fairfield, his

16   co-defendant, and insisted that one of the rooms in the

17   restaurant, the back room of the restaurant, to be decorated

18   with posters of the Mafia and be referred to as the, quote,

19   wise guy room.

03:01    20        He had silver plated AK-47 in his house.  When

21   communicating with his coconspirators, he would talk of popular

22   drug trafficking TV shows like, Narcos and El Chapo that were

23   commonly mentioned and referred to and bragged about.

24        The symbol that he used for his gambling business is a

03:01    25   mishmash of call outs to organized crime, including the

1    Sopranos and The Godfather.  It includes handguns.

2         Mr. Hanson wanted the world to know he loved wealthy,

3    luxury things, he loved wealth, and that he wanted to be

4    perceived as a mobster.  He wanted to be perceived as a mob

03:01   5    boss.  That is the choice that Mr. Hanson made, and now he is

6    facing mob boss time.  He is the only person who is responsible

7    for that decision.

8         Two final things, Your Honor.  This Court often sees a

9    lot of defendants who made hasty decisions, who may have been

03:02   10   motivated by economic desperation, and they receive sentences

11   that are quite severe and just, but approaching the level of

12   sentence Mr. Hanson is asking for in this Court.

13        There is differences between Mr. Hanson and those

14   defendants.  He was educated at one of the finest universities

03:02   15   in this country.  He received a business education from that

16   university.  He grew up in Redondo Beach.  He grew up in

17   wealth.

18        He was exposed to famous coaches, famous athletes.  He

19   had support of his family, and he chose to enter this life.

03:02   20   How many defendants that come before this Court who

21   receive severe sentences have -- could even dream of those

22   opportunities?  Mr. Hanson had those opportunities, and he

23   flushed them down the toilet, and he wasted them.

24        That disparity between what ones life can be and what

03:03   25   you choose to be is one of the reasons that the United States

1    is asking for this sentence that it is asking for here, and

2    that specifically goes to general deterrence.

3        Within his Blackberry there is a specific

4    communication that he has with some of his drug trafficking

03:03    5    coconspirators, and they brag about the way to never get caught

6    is to be a ghost, and before this Court today is one of those

7    ghosts.  The Court does not often have an opportunity to

8    sentence somebody like Owen Hanson, doesn't have an opportunity

9    to sentence somebody who has idolized organize crime, who chose

03:03    10    to join it and who is essentially the upper rung of drug

11    trafficking.

12        Suppose there is a person out there who is like Owen

13    Hanson, who is faced with these choices now, the sentence that

14    the Court hands down today may very well deter that person from

03:04    15    joining an industry -- a criminal industry like this.

16        With regard to specific deterrence, I will finish with

17    this, I am not personally convinced that a light sentence,

18    which frankly in this case, I think a light sentence is in the

19    10- to 11-year range, would specifically deter this defendant.

03:04    20        He certainly revealed to the Government and to the

21    Court that he has not turned completely in the right path.  And

22    I go back to when he is -- first went into prison and he

23    continued to run his gambling operation from the MCC, and that

24    didn't stop.  And of course, this Court is aware of other

03:04    25    actions that this defendant took that indicates that he is not

1    fully there yet.

2         And he may have in the future an opportunity to make

3    the right choices.  I hope that he does when he -- when and if

4    those opportunities arise, but at this moment I don't think a

03:04    5    sentence in the range that is being requested by defense

6    counsel is sufficient to deter him, and I think that number is

7    much closer to where the United States is, and so we would

8    reiterate our request that Owen Hanson be sentenced to

9    235 months.

03:05    10         THE COURT:  All right.  Thank you.

11         Mr. Cipriani, any comments that you would like to

12    make, sir?

13         MR. CIPRIANI (telephonically):  Yes, sir.  First of

14    all, I would like to thank the Court for making this

03:05    15    accommodation for me.  This is quite important.  This case

16    touches me for a lot of reasons.

17         First, I would like to say thank you to the FBI and

18    DOJ and the Assistant US Attorney and their tireless work in

19    this case.  All the agents involved have done an extraordinary

03:05    20    job and helped save the lives of both myself and my wife and

21    probably countless others.

22         Owen Hanson hired people to intimidate, threaten,

23    hurt, kidnap, and kill me and my wife.  While people all seem

24    to forget the countless lives that have been saved because the

03:06    25    drugs that Owen Hanson was selling was also destroying and

1    polluting lives.

2           Wherever these drugs were sold, lives were being

3    destroyed.   Families were being destroyed.   Lives were hanging

4    in the balance.   Our way of life was being jeopardize because

03:06   5    Owen Hanson's disregard for anyone but himself and would stay

6    in the drug business making his millions and millions and

7    silenced anyone who stood in his way, especially me.

8           I stood up to him and would not be bullied or

9    threatened in any way by him or his crew without repercussions.

03:06   10   I had to take matters in my own hands and find out everything

11   about him and his friends.   I was able to find out incredible

12   things that no one in law enforcement believed until I called

13   an Brett Finavio (phonetic) at the San Diego FBI.   He listened

14   and believed me.

03:06   15          The FBI agents involved in this case Brett, John, and

16   Nick are the real heros of this case, not me.   They believed me

17   when no one else in law enforcement would, including the FBI in

18   Philadelphia that I contacted, and I contacted a lot of

19   different agencies, and believe me, there were a lot, and the

03:07   20   San Diego FBI with the DOJ after I spoke to Brett connected all

21   the dots and did their jobs as FBI agents do every day for the

22   greatest country in the world, the United States of America.

23          I know the FBI is getting a lot of bad press around

24   the world lately, but people just don't know the real facts of

03:07   25   what the FBI does every day to protect us and our freedoms.

1    They keep our country safe.  We need the FBI more than you can

2    possibly imagine.

3            I also want to thank the Assistant Attorney Andrew

4    Young for all his hard work in prosecuting this case.  He did

03:08   5    his job times a thousand.  I'll never forget and always be

6    thankful for him bringing Owen Hanson and his cohorts to

7    justice.

8            I would like to say that this case has affected me in

9    many different ways, Your Honor.  First, my wife -- whoever was

03:08  10    speaking, I think it was the Assistant US Attorney, he

11    neglected to say that this DVD and the other things that Owen

12    Hanson did was not only to me but was to my wife.  She went

13    through hell because Owen Hanson and his determination and his

14    endless bank roll to intimidate to scare the hell out of her.

03:08  15            She is so fearful still today because of what Owen

16    Hanson put her through.  She constantly looks over her shoulder

17    wondering who will reach out to try to hurt her next.  She

18    can't even check her damn mail without being worried that it

19    has a package being sent by Owen Hanson or by one of his crew.

03:09  20            I have to take her everywhere she goes by car because

21    of this.  She is an actress and a model who goes to auditions

22    every day with the trepidation of not knowing if she will be

23    safe.  She won't forget what Owen Hanson did.  He sent a DVD

24    showing the beheadings of two men in the dirt saying that my

03:09  25    wife Grace and Robin Hood would be next and that this is what

1   happens to people that cross Owen Hanson.

2           He sent flowers and notes to my wife reminding her

3   that he knew exactly where she lived.  He called her countless

4   times on her cellphone to let her know that he was still on her

03:09   5   and he wasn't going to forget her.  She still to this day has

6   nightmares for years watching the beheadings of the DVD that

7   Owen Hanson sent to her and to me separately.

8           In the video Hanson has a masked man with a machine

9   gun call out her name, Grace, and say that her and I were next.

03:10   10   The video cuts to two men kneeling in the dirt with their hands

11   tied behind their back while two men stand near them.  After

12   talking, one gets beheaded with a chain saw while the other man

13   also kneeling watches in absolute horror, and then the other

14   masked man comes in frame and beheads the last man with a

03:10   15   butcher knife.

16           Words cannot describe to this Court the horror my wife

17   went through watching every frame in this video.  It was

18   gruesome.  What cowardly scum bags do this to some young

19   defenseless girl?

03:10   20           Don't forget about Charles D'Agostino.  His long time

21   friend, Owen Hanson's family lifetime friend -- I know that for

22   a fact because I spoke to him.  Charlie knew this kid, Owen

23   Hanson, grow up and knew him and his father and his family.  He

24   is not here because Owen Hanson put him in a position that one

03:11   25   day he thought there was no way out, that one day after working

1    he went to hang himself rather than face the embarrassment of

2    what he had to go through, to put his family through.

3              So right now his wife, his son and his daughter, don't

4    have Charles D'Agostino because of that defendant that is

03:11    5    sitting there in the courtroom.  He caused a man to hang

6    himself and take his own life rather than face the music.

7              This has been an incredible situation that I have

8    lived through, Your Honor.  I don't want to bring this up after

9    what I mentioned, but as far as it has affected me, I am

03:11    10   professional gambler and philanthropist, and I help people all

11   over of the world, Your Honor, with my gambling winnings.  I go

12   by the name Robin Hood 702.

13             Because of this case I have barred by the most -- the

14   biggest casinos all over the world because the casino

03:12    15   compliance departments thought I was part of this drug gambling

16   ring and this money laundering ring.  My name needs to be

17   cleared so I can have my life back and to continue to help

18   people all over the world with my gambling exploits.

19             But one thing I want Owen Hanson to know as he sits

03:12    20   there, he made his biggest mistake in his criminal career when

21   he paid someone thousands of dollars to drive from Los Angeles

22   to Philadelphia to desecrate my mother and father's grave.

23   What Owen Hanson forgot is that my mother Regina was the person

24   I held in the most regard for in my life.

03:12    25             I took care of her for six and a half years while she

1   was battling Alzheimer's.  I was the one that fed her, changed

2   her diapers, washed her every day, doing all the things that a

3   man should never have to do for a woman, especially his old

4   fashioned, very reserved and very proud mom.

03:13   5         While day after day she forgot little by little who I

6   even was and couldn't remember my name most days, Regina

7   Cipriani was the best human being, the most caring, the most

8   loving, the most generous person I ever knew, and I had the

9   distinct pleasure of calling her mom.

03:13   10         This is who Owen Hanson decided to desecrate her grave

11   in Phili, and this is when I knew that I had to put every one

12   of these bastards in jail.

13         So, please, Judge, recognize what I am telling you and

14   please give Owen Hanson the maximum sentence that he has

03:13   15   already pled to, 20 years minimum mandatory in prison.  Send a

16   scrolled message, Judge, to the other drug dealers in the world

17   that this drug business is what is ruining our country, our

18   kids, our families, and our future.  More than anything, it

19   won't be tolerated in the US of A.

03:14   20         And the last thing that I want to say to Owen Hanson,

21   while you sit there and you are facing decades in jail, your

22   wife, Crista Valarde, has moved on with her life and your money

23   and has been spending your money and having a grand old time

24   travelling and dating and having sex --

03:14   25         THE COURT:  Mr. Cipriani --

1        MR. CIPRIANI (telephonically):  -- with both men and

2   woman.

3        THE COURT:  -- I think we're finished now.  I don't

4   think that type of comment is appropriate at the sentencing

03:14   5   hearing, and so --

6        MR. CIPRIANI (telephonically):  Okay, Your Honor.

7        THE COURT:  You completed your remarks, is that

8   correct, sir?

9        MR. CIPRIANI (telephonically):  Let me leave you with

03:14  10   this, Your Honor --

11        THE COURT:  Sure.

12        MR. CIPRIANI (telephonically):  -- I am not asking

13   you, I am begging you, Your Honor, to give this man the

14   maximum, because once he is out, he is only going to come after

03:14  15   me, Chris -- you know, my wife, and whoever else stood in his

16   way and put them where he is today.  I am asking you, pleading

17   with the Court, to give him the full sentence, Your Honor.

18        I thank you for giving me the time here today.  I

19   thank the FBI and the DOJ and all the Assistant US Attorneys

03:15  20   that made this case happen and put these people behind bars.

21   Thank you so much.

22        THE COURT:  You are welcome, sir.

23        All right.  There are no other victims that wish to

24   present, is that correct, counsel?

03:15  25        MR. YOUNG:  That's correct, Your Honor.  We intended

1    to locate the victims specifically in Minneapolis, and we have

2    not been able to find them.

3             THE COURT:  Mr. Adams, what was your position on the

4    fine?  The presentence report recommends a $25,000 fine on

03:15    5    each -- which I interpret to mean on each count.

6             MR. ADAMS:  Your Honor, we recommend no fine in light

7    of the forfeiture judgment.

8             THE COURT:  All right.  What is the Government's

9    position with respect to the fine?

03:15   10             MR. YOUNG:  With respect to the forfeiture, Your

11    Honor, we also don't recommend a fine.

12             THE COURT:  Is that in light of the $5 million

13    forfeiture?

14             MR. YOUNG:  Correct.

03:15   15             THE COURT:  Thank you, counsel.

16             Anything --

17             MR. ADAMS:  Your Honor, I just wanted to make a couple

18    of observations.  I don't think that Mr. Cipriani's comments

19    are really entirely appropriate.  He has a history himself of

03:16   20    using the internet to attack other people.

21             THE COURT:  I don't know that that is, you know --

22    Mr. Cipriani is not being sentenced here.  The comments that he

23    spoke about deal with information that is in the presentence

24    report.  I understood his comments to be primarily directed

03:16   25    towards the information that is in the presentence report.

1          MR. ADAMS:  Well, Your Honor, he himself was an

2    unindicted co-conspirator in this case.  He earned money as

3    part of this, and he was banned from the casinos for a reason,

4    because he was involved in the money laundering operation of

03:16    5    this.

6          I don't think that he feels threatened in the least by

7    Mr. Owen Hanson.  In fact, he's made threats towards

8    Mr. Hanson.  And he made threats here in court this afternoon

9    by telephone, and he has made threats using the internet

03:16    10   against Mr. Hanson and his family.

11         So I think the Court needs to temper the remarks that

12   we heard from Mr. Cipriani with an understanding of his

13   background, including his own criminal conviction for fraud and

14   using the Court's to perpetuate fraud in Philadelphia.

03:17    15         I do want to point out also that Mr. Hanson is very

16   ashamed of his conduct.  He was using illegal drugs, including

17   steroids, during the period of time that he was making these

18   decisions and judgment.  He is not a mobster.  He is not a mob

19   kingpin.  He is not a drug kingpin.  He is not a killer, and he

03:17    20   didn't threaten people himself.

21         THE COURT:  Thank you.

22         MR. ADAMS:  Thank you, Your Honor.

23         THE COURT:  Thank you, sir.

24         Mr. Hanson did plead guilty to two counts.  He pled

03:17    25   guilty to Count 1, a superseding indictment which charged a

1   violation of Title 18, United States Code, Section 1962,

2   racketeering conspiracy to conduct enterprise affairs; and he

3   also pled guilty to Count 4 of a superseding indictment,

4   violation of Title 21, United States Code, Section 841(a)(1)

03:17   5   and 846, conspiracy to distribute illegal narcotics.

6           First, some of the facts of the case -- the case is

7   laid out in some detail in the plea agreement.  All these facts

8   are facts that Mr. Hanson agreed to:

9           The enterprise of the racketeering conspiracy was

03:18   10   known as ODOG.  It was an enterprise.  It was an association

11   and a group of individuals who were associated in fact for the

12   purpose of importing, exporting, and distributing controlled

13   substances; conducting an illegal gambling business;

14   transmitting wagering information, bookmaking, using telephones

03:18   15   and the internet in aid of those racketeering activities; money

16   laundering and other acts related to maintaining the illegal

17   operation and avoiding detection by law enforcement.

18           ODOG imported, exported, distributed throughout the

19   United States, Australia, and elsewhere wholesale and retail

03:18   20   quantities of cocaine, methamphetamine, heroin, ecstasy.

21           ODOG operated internet sports gambling websites which

22   were hosted on servers located outside the United States.

23           ODOG also operated toll free telephone services to

24   facilitate sports betting.

03:19   25           In addition to operating in Central and South America,

1    ODOG operated within the United States, primarily within the

2    Southern District and Central District of California by, among

3    other things, offering, conducting, and facilitating unlawful

4    computer and telephone service-based sports gambling using

03:19   5    ODOG's websites and toll free numbers.

6            Mr. Hanson admitted that he was the founder and leader

7    of ODOG.  He managed and directed ODOG operations primarily

8    from Southern California.  Mr. Hanson, again, admitted that he

9    was organizer and leader of ODOG with decisionmaking authority

03:19   10   over all drug distribution and gambling operations.

11           ODOG's distribution and gambling operations involved

12   more than 20 individuals.

13           Again, the defendant admitted that he oversaw a drug

14   distribution network of more than five individuals that

03:20   15   imported, exported, and distributed throughout the United

16   States, Australia, and elsewhere hundreds of kilos of cocaine,

17   heroin, methamphetamine, MDA, anabolic steroids, human growth

18   hormone.

19           The drug operation at Hanson's directions distributed

03:20   20   controlled substances at wholesale and retail values and

21   routinely provided controlled substances, including

22   performance-enhancing drugs to professional athletes.

23           He also oversaw an illegal gambling network of more

24   than 20 individuals including managers, bookies, runners, and

03:20   25   enforcements.  The gambling network accepted wagers on sporting

1    events from individuals throughout the United States, including

2    Southern California.

3         Also, just as set forth in the presentence report,

4    some additional facts:  On June 10th of 2011, Mr. Hanson caused

03:21    5    an individual to transport approximately a million and a half

6    in drug trafficking proceeds from Australia to Las Vegas,

7    Nevada.

8         In August of 2011 he attempted to cause an individual

9    to transport two and a half million dollars in criminal

03:21    10   proceeds from Australia to the United States.

11        From September -- just from September 4th to

12   September 8th of 2015, Mr. Hanson caused co-conspirators to

13   package and ship more than 250 kilograms of cocaine from Los

14   Angeles, California, to locations unknown.

03:21    15        There are also the incidents that have been referred

16   to by Government counsel and by Mr. Cipriani concerning the

17   threats that were also made.

18        The Advisory Guidelines, both start at a Base Offense

19   Level 38.  There is a plus two pursuant to Section 2D1.1B2, use

03:22    20   of violence, slash, credible threats.  The plus four for role

21   in the offense.  It is aggravated organizer and leader.  The

22   Adjusted Offense Level is 44.  There is a three-level reduction

23   for acceptance of responsibility.

24        The Total Offense Level is 41.  The defendant has four

03:22    25   criminal history points.  I find that he is in a Criminal

1   History Category III.  I don't find that it is

2   over-represented.  It is certainly not the worst Criminal

3   History Category III that I have seen, but I don't find as

4   matter of law that it is over-represented.

03:22   5          The Guideline Range before any departures is 360 to

6   life.  The Court will depart downward three levels pursuant to

7   Section 5K1.1 as requested by the Government.  I made some

8   comments about that previously.  I think it is -- I think it is

9   more than fair.  I think under some circumstances, the

03:23   10   Government would have been certainly justified to make no

11   departure and to preclude any additional opportunity.

12          And unfortunately, Mr. Hanson, you know, since the

13   time of your arrest you, you know, in some respects have been

14   your own worst enemy.

03:23   15          Certainly the -- you know, Mr. Adams, in your

16   sentencing memorandum, you do request -- you mentioned his

17   extraordinary post-arrest rehabilitation while on pretrial

18   detention.  You know, he certainly has done some positive

19   things while he was detained, but, you know, as we discussed,

03:24   20   he did some things that were -- you know, that were not

21   positive, that undercut his position greatly.

22          And it is not surprising -- he is not the first person

23   to engage in that conduct after arrest, and, you know, he lived

24   a life of -- there is no kind way of saying it, he was a

03:24   25   criminal for a number of years, and so when some people are in

1    custody, it -- I think it is unrealistic to expect them to

2    change the way they look at things instantaneously.  It usually

3    does not happen.

4         But, you know, the Guideline Range -- and the

03:24   5    guidelines are only advisory, but they are 360 to life, and,

6    you know, the Government has requested a downward departure.

7    You know, I granted it, but it's -- the Government clearly

8    could have said no, none, and that would be a justifiable

9    position, and it also would have been a justifiable position to

03:25  10    not prevent any additional opportunity.

11         But on the other hand, I do think that the three is

12    warranted because in addition to the negative there are some

13    positives, and so I think the Government's position, their

14    request, is warranted.  I don't think that anything above that

03:25  15    is.

16         And one can't say what it would have been but for, you

17    know, the negatives.  It would have been more than what it is,

18    though, I can tell you that, but it is what it is, and it is

19    not as bad as it could have been, but it is not as good as it

03:25  20    could have been, and that is -- Mr. Hanson knows better than

21    anybody why that is the case, unfortunately.

22         With respect to the 3553 factors, the nature and

23    circumstances of the offense, this is an aggravated case.  The

24    size of the drug trafficking organization is staggering as well

03:26  25    as the, you know, the gambling enterprise.  I mean, Mr. Hanson,

1    you know, put together a very large organization.

2          And it is not -- this wasn't somebody who was trying

3    to smuggle drugs, you know, a couple carloads of drugs from

4    Mexico to the United States.  He was he was an international

03:26    5    drug trafficker.  He was very, very successful.

6          And he had access to huge amounts of cocaine.  I mean,

7    he moved -- he moved hundreds of kilos sometimes a month from

8    Mexico to the United States or to Canada or other places.  It

9    is astounding that somebody has access to literally hundreds of

03:26    10    kilos a month, and all over the globe.

11          He was very, very well compensated.  He took -- he

12    took a large risk, and generally when people get to his level,

13    the risk is enormous, as he well knows, and I am sure he knew

14    then, but the financial rewards they are enormous as well.

03:27    15          The Government -- he is forfeiting $5 million worth of

16    property.  That is what he is forfeiting.  Who knows what he

17    earned previously, but you look at what he gave up, and the

18    Government counsel alluded to, there is no need for me to go

19    back over it, but it is multiple cars, tremendous amounts of

03:27    20    cash, country club memberships.

21          One has to wonder how much is enough.  But the size of

22    it, both the gambling organization and the drug -- the size of

23    the drug organization is astounding.  He was an international

24    drug trafficker, and that is not an overstatement when one

03:27    25    looks at just the volume and the money.  That is -- that is

1    just the reality.

2              You know, the history and characteristics of

3    Mr. Hanson, like with most individuals that come here, they are

4    mixed.  It is hard to understand, Mr. Hanson, how you ended up

03:28    5    here.  It really is.  When one looks at your upbringing where

6    you went to school, the opportunities you had -- I mean, for

7    the parents and for the people who know you, it has to be

8    heartbreaking to see somebody, I mean, with the potential and

9    the opportunity.  I can't imagine what is going through their

03:28   10    hearts and their minds.  It literally has to be heartbreaking

11    for them.

12              To see somebody who had so much potential -- it is

13    hard to understand, and as Government counsel pointed out, most

14    of the time the people are here who really get big in the drug

03:28   15    business, they started because a perceived lack of any

16    opportunity.  Many of them came from poverty, and they saw it

17    as the only way out, and they made it, and it just leads on

18    itself.

19              I have people in here not -- well, a couple months

03:28   20    ago, both their mothers and fathers were drug dealers.  They

21    got involved in the drug business when they were 14 years old.

22    I was sentencing somebody here when he was 18, and his mother

23    and father were drug dealers and sister were.  That is all he

24    knew.  They were drug dealer people in the household.

03:29   25              And I told him if your mother and father were

```
        1   engineers, there is a good chance you would be an engineer, but
        2   that is what happened.  It was the environment that he was in.
        3           For you, it is hard to explain, and the fact that you
        4   came from a community that was relatively well off, and you
03:29   5   won't be treated nor should you be treated any more harshly
        6   than anybody who came from poverty.  And both the rich and the
        7   poor are entitled to the same justice.  Just because somebody
        8   is poor, doesn't mean that they get less, and just because
        9   somebody is wealthy is treated differently more harshly or the
03:29  10   same.
       11           It is just difficult to understand how you got here
       12   other than greed.  It doesn't sound nice, but I mean, other
       13   than that, I don't really understand.  You were well-educated.
       14   You did well in high school.  You grew up in a community that
03:30  15   most people would like to grow up in.  You went to -- had the
       16   opportunity to go to school.  You did well.  You attended
       17   classes.  When you got out, you were successful, and, you know,
       18   in a legitimate, lawful employment.  You were fairly
       19   successful.
03:30  20           You know, I don't know what prompted it.  I
       21   understand, you know, there is some suggestion, you know, maybe
       22   the downturn in '08 may have been a factor.  I don't know if
       23   that is the case or not or this really started in college.  It
       24   doesn't really matter because -- there is a downturn and most
03:30  25   people, they weathered it.
```

1          And, you know, for whatever reason you elected to use

2    your talents to engage in this behavior.  It was wide ranging.

3    It was for an extended period of time.  You know, as Government

4    counsel points out, we get people in here every week that are

03:30   5    18, 19, they make a bad decision.  They drive drugs from Mexico

6    to the United States.  They do it one time, two times, three

7    times, there is 20 kilos of meth in it.

8          And they were told 40 months, 60 months, 70 months.

9    Some may get more.  Some may get less.  Their judgment is

03:31  10    usually bad.  They don't have a lot of life experience, and

11    some just some from abject poverty.  They are just as poor as

12    can be, and 2,000 sounds like a greet deal and they just do it,

13    and they don't have much time to reflect on it.

14          Unfortunately for you, you had a lot of time to

03:31  15    reflect.  You had life experience.  You had judgment.  And for

16    whatever reason you just continue to engage in this behavior.

17          I should note that with the three-level reduction, I

18    do find the Guideline Range to be 262 to 327.  So I did depart

19    downward three levels, so that is what I find.  I find the

03:31  20    Guideline Range to be 362 -- 262 to 327.

21          And as I noted, it would have been -- your Guideline

22    Range would have been lower but for some things that you did

23    post-arrest that really simply did not -- did not help you.

24          The need for the sentence to reflect the seriousness

03:32  25    of the offense, promote respect for the law, and provide just

1   punishment, in this case the Court is going to impose a

2   sentence of 255 months.

3        I think it is the minimum sentence to satisfy the 3553

4   factors.  I don't think that a sentence of ten years would.

03:32   5        And I understand, Mr. Adams, that, you know, you

6   certainly made a strong argument, but there are people who do a

7   fraction, a fraction of what, you know, Mr. Hanson has done,

8   and they receive sentences that are in that ballpark.

9        And generally when the Court sentences people here on

03:32   10  drug cases -- and there are a tremendous amount of drug cases

11  here in the Southern District of California.  We get the

12  low-level people.  We get the people at the bottom.  We don't

13  get the people that are at the top.  And by anybody's

14  definition, Mr. Hanson was at the top, and he was at the top

03:33   15  for a long period of time.

16        And the risks are great.  The rewards were tremendous,

17  but people who are making millions of dollars in the drug

18  business when they are caught -- and I don't know what

19  percentage of them are caught, my guess is not many -- the

03:33   20  sanctions are high.

21        I am mindful of how much time that is for someone who

22  has never spent real time in custody and somebody who is as

23  young as you are, but I do note that the Guideline Range before

24  this was 360 to life.  This sentence is significantly less than

03:33   25  that.  But in light of the wide-scale organization, I think

1    that any sentence less than that would cause an unwarranted

2    sentencing disparity when one considers what people typically

3    get for dealing in drugs at a level much, much lower than you

4    did, and, again, that also has to take into account the

03:33  5    gambling aspects of the case.

6            I've considered all 3553 factors, all the arguments of

7    counsel, all the submissions to the Court, all the comments

8    that have been made by counsel, and certainly those comments

9    that we addressed at sidebar, and I take into account --

03:34  10   obviously, I've taken into account those comments as well.

11           Therefore, pursuant to the Sentencing Reform Act of

12   1984, it is the judgment of this Court that the defendant is

13   committed to the custody of Bureau of Prisons to be imprisoned

14   for a period of 255 months on Count 1, 255 months on Count 4,

03:34  15   with a ten-year period of Supervised Release.

16           And the sentences -- the custodial sentences are to be

17   served concurrently.  The Supervised Release is to be served

18   concurrently, ten years on each count.

19           The Court imposes the mandatory and standard

03:34  20   conditions of supervision and the following special conditions:

21           That he not engage in the employment or profession

22   involving gambling, that he report all vehicles owned or

23   operated or in which he has an interest to the probation

24   officer.

03:35  25           That he submit his person, property, residence,

1    office, or vehicle to a search conducted by a United States

2    probation officer at a reasonable time and in a reasonable

3    manner, based upon reasonable suspicion of contraband or

4    evidence of a violation of a condition of release.

03:35    5          Failure to submit to a search may be grounds for

6    revocation.

7          Defendant shall warn any other residents that the

8    premises may be subject to searches pursuant to this condition.

9          Provide complete disclosure, personal and business

03:35   10    financial records, to the probation officer as requested.

11          Notify the Collections Unit, United States Attorneys

12    Office, of any interest in property obtained directly or

13    indirectly, including any interest obtained under any other

14    name or entity, including a trust, partnership, or corporation,

03:35   15    until the fine or restitution is paid in full.

16          Notify the Collections Unit, United States Attorneys

17    Office, before transferring any interest in property owned

18    directly or indirectly, including any interest held or owned

19    under any other name or entity, including a trust, partnership,

03:35   20    or corporation.

21          Be prohibited from opening checking accounts or

22    incurring new credit charges or opening additional lines of

23    credit without approval of the probation officer.

24          The Court does not impose a fine, finding the

03:36   25    defendant does not have the financial ability to pay a fine.

|      |     |                                                                |
|------|-----|----------------------------------------------------------------|
|      | 1   | The Court does impose the required $100 mandatory |
|      | 2   | special penalty assessment on Counts 1 and 2 for a total |
|      | 3   | assessment of $200. |
|      | 4   | The Court will recommend that the defendant be |
| 03:36 | 5  | permitted to participate in the 500-hour drug treatment |
|      | 6   | program. |
|      | 7   | The Court will also recommend that the defendant be |
|      | 8   | designated to a facility in the Central District of California |
|      | 9   | as close to Los Angeles area as possible. |
| 03:36 | 10 | The Court declines to recommend to the Bureau of |
|      | 11  | Prisons as to whether or not they should make any adjustment to |
|      | 12  | a halfway house 24 months out.  I think that it is just too |
|      | 13  | early to discuss that at this point. |
|      | 14  | Counsel, would you please come forward and obtain a |
| 03:36 | 15 | copy of the terms of Supervised Release, and please provide a |
|      | 16  | copy of those to your client. |
|      | 17  | MR. ADAMS:  Yes, Your Honor.  Thank you. |
|      | 18  | THE COURT:  Are there additional counts to dismiss, |
|      | 19  | counsel? |
| 03:36 | 20 | MR. YOUNG:  Yes, Your Honor.  The Government dismisses |
|      | 21  | Counts 2 and 3. |
|      | 22  | And I believe you misspoke on the $100 assessment. |
|      | 23  | You said Counts 1 and 2. |
|      | 24  | THE COURT:  I'm sorry.  Counts 1 and 4.  Counts 1 and |
| 03:37 | 25 | 4 are $100 penalty assessment, with a total assessment of $200. |

1             On Counts 1 and 4, the custodial portion of the

2   sentences are to be served concurrently.

3             On Counts 1 and 4, the Supervised Release is to be

4   served concurrently.

03:37   5             Counsel, in light of the sentence imposed, does your

6   client waive his right to appeal?

7             MR. ADAMS:  He does.

8             THE COURT:  Anything further?

9             MR. ADAMS:  No.  Thank you.

03:37   10            THE COURT:  All right.  Good luck to you, sir.

11       (Proceedings concluded at 3:37 p.m.)

12                         ---000---

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C-E-R-T-I-F-I-C-A-T-I-O-N

2

3            I hereby certify that I am a duly appointed, qualified

4   and acting official Court Reporter for the United States

5   District Court; that the foregoing is a true and correct

6   transcript of the proceedings had in the aforementioned cause;

7   that said transcript is a true and correct transcription of my

8   stenographic notes; and that the format used herein complies

9   with the rules and requirements of the United States Judicial

10  Conference.

11            DATED:  December 24, 2017, at San Diego, California.

12

13                                /s/ Melinda S. Setterman
                                  _____
14                                Melinda S. Setterman,
                                  Registered Professional Reporter
15                                Certified Realtime Reporter

16

17

18

19

20

21

22

23

24

25